The next case we have for argument is Concerned Jewish Parents & Teachers of L.A. v. Liberated Ethnic Studies Model Curriculum Consortium et al. Good morning, Your Honors. Jeremy Rosen of Horvitz & Levy for the appellants. I'd like to reserve five minutes for rebuttal, subject to, of course, the Court's questions. As a roadmap, I'd like to first begin with the anti-SLAPP issue that was the subject of the Court's supplemental briefing order, and then I'd like to turn to the Rule 12b motion and why that should also be reversed. There's obviously more issues in the 12b motion than can be possibly discussed at argument, so I'll try to highlight. Actually, could you first address standing since that's a threshold issue? Certainly. On the standing question, I think there are a couple of observations. First, I think in the complaint as pleaded, there are sufficient allegations that the plaintiffs, both parents on behalf of their children and teachers who teach in LAUSD, are subject to the hostile environment created by the spread and the increasing spread of these anti-Semitic teaching materials that are starting to infiltrate the school. And I think one of the issues possibly for an amendment, which we pointed out in our reply brief because that was just after California enacted AB 715, which amended California Education Code 51500, among other provisions. And there, the California legislature made clear that discriminatory bias in instruction and at school does not require a showing of direct harm to members of a protected group, and members of a protected group do not need to be directly there when it happens. It's just enough that they are part of a community where they are now a hostile environment. And if you look at Spokio, now Spokio, of course, was speaking about Congress, but the Supreme Court in Spokio noted that Congress does have the ability not to tell the Supreme Court how to adjudicate what is an injury in fact. But through its statutory enactments and creating injuries through statutory claims, it has the ability to inform the court's standing analysis. And likewise here in Spokio and TransUnion, they said, yes, maybe, if there's a common law basis for it. And the hostile environment, I don't think there's any real common law basis for that. It's all statutory basis. Well, but I think the long history, even a statutory basis for a hostile environment allows for such claims to be brought when there are here specific state law claims. I don't think Spokio was saying common law, meaning starting from the 1960s or 70s. I think it's from closer to the founding era or around that time or at least a couple hundred years or a hundred plus years of common law origin. Well, but I think – Then you completely undermine the entire basis of Spokio and TransUnion, which was Congress can't create Article III standing through legislation. I think it is true as a technical matter that Congress cannot or a state legislature in this instance cannot directly compel a court to find that there is Article III standing. But I think what Spokio does say is – I mean it does talk about sort of common law and history. But it also talks about how Congress can inform that through statutory enactments that demonstrate particular injuries. And I think the particular – let me just get to the particular language in – the particular language in Spokio is that Congress is well positioned to identify intangible harms that meet minimum Article III requirements. Its judgment is instructive and important. So I think, well, you are certainly correct that Congress or here the state legislature cannot direct a court in terms to find Article III standing. It is certainly allowed to be instructive. And I think here it makes sense to look at a hostile environment claim, especially at the pleadings. And I think it's also important. We're still at the pleadings. We also, despite the fact that the federal rules require and allow for discovery shortly after a complaint is filed. And even though the district court's here standing order also makes clear that discovery goes – is ongoing during Rule 12. So either in the current complaint or as amended, could your clients plead any tangible injury? Well, I think it depends on what you – I think the tangible injury, I think there's an increase in bullying going on in LAUSD since the last amended complaint. I mean you also have to – Experienced by any of your clients or just in general? Certainly by members of the concerned parents, which does have organizational standing on behalf of its members. I think there could be an allegation that their members have received or the members' children have received bullying. There's certainly already an example of one of the plaintiff teachers who just in the complaint as drafted, although there could be additional allegations since then, was barred from finding – barred from attending a presentation where these anti-Semitic materials were presented to other teachers as a way to infiltrate them into classrooms, and she was barred because she was Jewish. That was not the school though. That was not the school district, right? That was not the school district, but here we obviously – it's not only the school district that is being sued but also the union and the sort of consortium who develops the materials. As far as the school district is concerned, at this point, the injuries are more dignitary or stigmatic, right? Is that a good way to put it? A child being fearful of expressing their own Jewish identity in the public schools is very traumatizing and not something that should be tolerated. I'm sorry, but I've read the complaint. I didn't see any specific allegations about acts of bullying. That is true, and I think that is where I'm – there could be an amended complaint to discuss issues of bullying. I was responding to a question about what additional things could be added. And that's something – and it seems to make sense to give – be allowed to amend the complaint. But as pleaded right now, what the facts are, the curriculum has not been adopted. But the allegation is that two teachers are teaching this material in their classrooms. So obviously I think if a student who's in the classroom would have standing, maybe a student in the same school perhaps have standing. And maybe even students in another school district is facing discrimination or is bullying and can connect it to the curriculum or the spread of the curriculum, they can make that connection. I think they would have standing presumably, but I guess without that connection, I don't see it in the complaint because otherwise LAUSD has 100,000 high school students. It seems quite an expansion of Article 3 standing to say any of the 100,000 high school students would have standing because of what happens in one school or one classroom. I think that's a fair point, and I would just say that it is unusual, although it's not per se, of course, a basis for reversal. But I would note that it's unusual that they're not believed to amend the first time that a district court, after two and a half years handling a case, says anything about the merits of the case. And so I would ask that we have the opportunity to replead with the guidance from your honors about what would be necessary to plead there. I will also say that because of how long this case sat on the 12B6 and the anti-slap motions in the district court, and then the time on appeal, it's been multiple years. And there have been lots of intervening events that would add a lot of salutary details to the complaint if we had the opportunity to replead. So I would respectfully request at least one opportunity to replead with, of course, your honors' guidance as to what defects you see in the existing complaint. Counsel, while we're on the issue of the sufficiency of the pleadings, I do want to ask, do you think that the Supreme Court standard for pleading conspiracy allegations in Bell Atlantic v. Twombly apply to your conspiracy allegations? And if so, is that standard met? I do believe Twombly certainly applies to any complaint in federal court. I do believe they are met, although I take the criticisms, and I think we acknowledge that the complaint could have been more artfully drafted. I think that as to the conspiracy, I think the basics of the conspiracy are alleged. I think that more could be alleged. Part of the problem, of course, is that we were deprived discovery that would ordinarily have occurred. I think if we were to get access, as I think we're entitled to, the e-mails between all of the actors, have a few depositions of the actors, there would be a lot more specific evidence to connect the dot on the conspiracy. Right now, with our clients being shut out of the meetings where this is happening, where the official curriculum committee, which is supposed to report publicly pursuant to state law, which is one of the claims of relief we're seeking for, is to force that committee to be public about what materials it is sending to the schools. They are working in secret, which also then makes it very difficult to get the specific allegations. So I would hope on remand, and I would humbly suggest in the disposition that the court mentioned that generally discovery is something that happens at the pleadings. Between discovery plus the events of the last couple years with respect to my clients, there would be much more specifics that we could allege in the complaint. I would just say it's a very serious issue. Sorry. Did you file a motion to take discovery regarding standing issues? The other side filed a motion to stop – we actually propounded the usual discovery. They filed a motion to stop discovery, and the district court, without explanation, at the end of an order on a different – that related to other issues in the case, just said discovery is stayed. I would point out that – and this is sort of a transition potentially to the anti-SLAPP issue. One of the bases that the other side asked for for a stay on discovery was California's anti-SLAPP statute's discovery stay, which of course is not supposed to apply in federal court and is one of the many alterations that this court has made over the past 25 years. Before you get to the anti-SLAPP issue, the one question I had is why was the LAUSD named a nominal defendant? I think that on amendment, they would – the nominal would come out, and they would actually just be a regular defendant. It seems like the heart of the case is LAUSD. Yes, the heart of the case is LAUSD. And I would just point out just another – I know there are so many issues of intervening Supreme Court authority, but I think a critical intervening authority is the arm of the state. As in our 28-J letter, we pointed out the recent U.S. Supreme Court decision, which has – I think makes it clear that the key question you look at for whether someone is armed with state is whether it's an independent legal entity. And I would just point out under the education – California Education Code 35162 says that in the name by which the district is designated, the governing board may sue and be sued, hold and convey property for the use and benefit of the school district. And Education Code 35200, the governing board of any school district is liable as such in the name of the district for all debts and contracts. And Education Code 35214, the board of governors of a school district may provide protection from its own funds for the purpose of covering the liability of the district. I think obviously at the pleading stage there hasn't been evidence, but that would be part of the amended complaint that we should be allowed to put forward is that under the new governing rule from the Supreme Court, LAUSD is no longer an arm of the state. And I think this court's prior precedence under older precedent that I think has not only been overturned by an en banc panel of this court, but I think even this court's en banc panel, an arm of the state, is – it's closer to the real rule, but I think the Supreme Court has really clarified. And the key focus now is whether it's an independent legal entity, and I think LAUSD is. And part of the amendment of the complaint would also be to make it clear that LAUSD is a prime defendant. And I'd request the opportunity to have that. If we go now to the anti-SLAPP, as you probably know, both Judge Blumenthal and I joined Judge Bress's concurrence in Gopher Media. And even pre-Burke, we thought that anti-SLAPP fee provision can't be applied in federal court. But the one issue now is do we need an en banc court or can we do it ourselves? That is, what is different about Burke as opposed to the prior precedence we had, Shady Grove, etc., that would make it clearly or conciliable such that our three-judge panel can overturn another three-judge panel? Or is this something we have to let an en banc panel decide? So I will give you specific answers in a second to those questions about why sort of at least observations I have as to why this panel could do it. I would just like to start with a broader point that this court's sort of prior en banc position in GAMI, which came up with the clearly irreconcilable, that is a decision of sort of internal governance of the court. It's not something that's required by a statute or the Constitution. Different circuits do it differently, so I would not presume to tell you all how to decide whether a panel or an en banc. What I would say is that both before Burke and certainly in light of Burke, there is no way that California's anti-SLAPP statute as a matter of law can apply in federal court. And I would say and I would urge you, whether you do it by the panel, which I think you can, which I'll explain in a second, or initial en banc, that you take away the specter with directions that my clients cannot be under what could be mounting seven-figure attorney fee awards to continue their civil rights action. What I do think that Burke versus Choi did that is different than prior authority is it made it very clear that you can't rework a state statute to make it fit into the federal rules. In fact, it explains in a number of places that the defendants in Burke were trying to come up with creative ways to save the affidavit requirement. And the Supreme Court says, no, you can't do that. Also, isn't this case a little different where we would just not be applying some provisions of the anti-SLAPP Act versus other? I mean, I don't see anything that is actually requiring us to reinterpret a particular provision in the way that was happening in Burke. But the problem is that the California legislature passed a single statute that has lots of provisions. If you look at the fee provision, for instance, which is basically all that's left, subdivision C, it says that the prevailing defendant in a special motion to strike is entitled to fees. Well, a special motion to strike in the statutory text refers to the California special motion to strike, which includes things like a discovery stay, filing within 60 days of the complaint, no leave to amend, a heightened pleading standards, interlocutory appeal. All of these things that the Ninth Circuit has stripped out. So what it is applying now is just a free-floating fee provision, which I think Burke makes it very clear that you don't get to have a freestanding provision that's sort of in the ether after it's been radically and surgically altered by a court to allow it to fit. The other thing that's very different between Burke and prior precedent is Shady Grove, as you all know, was a plurality opinion by Justice Scalia. Justice Stevens provided the fifth vote for the result. But Justice Scalia and Justice Stevens disagreed sharply on a key provision that's relevant here. Justice Scalia said in the plurality that the key focus is whether the federal rule governs procedure. And if it does and answers the same question, that's the end of the story. Justice Stevens said the key question is whether the state rule is substantive or procedural. And he in that case found that it to be procedural and therefore the federal rule would govern. What Burke does is it takes Justice Scalia's plurality opinion and makes it the binding law of the Supreme Court and binding on this court that the key inquiry is whether the federal rule is procedural. And Rule 12 and Rule 56 are procedural. And they answer the same question as the anti-slap statute. The anti-slap statute is not a fee statute. It is a procedural device for the early termination of lawsuits at the pleadings. That is also what Rule 12 and Rule 56 does. You cannot have any more in federal court applying a state statute with attorney's fees that answers the same question as Rule 12 and Rule 56. Counsel, that leads me to another question. If a court under my understanding, our precedent is if there is no Article 3 jurisdiction, we don't have jurisdiction to even reach an attorney's fees motion unless there's a special statute that confers jurisdiction over an attorney's fee motion. And that's a rare situation. For example, Rule 11 or some other statute. How does that precedent apply here? If we were to find that there was no Article 3 jurisdiction, which is the first ground that the district court dismissed on lack of standing, did the district court even have jurisdiction to award attorney's fees under the anti-slap statute? I think if there's truly no jurisdiction, there would be no jurisdiction to award attorney's fees either. But I think here, if the disposition is to reverse and remand on 12B for an attempt to replead, then I think that there still has to be a ruling on the grant of the anti-slap motion. And I think it would be most prudent to sort of address finally the question of whether you can have an anti-slap motion in federal court and just reverse that motion with direction so that on remand, the focus can be can we get some discovery? Can we file an amended complaint that meets Article 3 standing and the other objections? And then there can be further Rule 12 motions or Rule 56 motions or whatever may happen. Okay. Thank you. Great. Thank you. I know we took you over time. I'll give you an extra two minutes. Thank you, Your Honor. Good morning, and may it please the Court. My name is Sarah Koehler, and I represent Appellees United Teachers Los Angeles and Cecily Mayer-Cruz. I would like to reserve 10 minutes of appellee's time for my colleagues representing the Liberated Ethnic Studies Model Curriculum Consortium and Los Angeles Unified School District. The district court correctly dismissed all claims against all of the defendants, but in particular, UTLA. None of plaintiff's claims survive against UTLA. Appellants have only brought the UTLA defendants into this case to penalize them for their protected speech, and if the case is remanded in any form, the dismissal against UTLA should stand. UTLA is a labor union, and Ms. Mayer-Cruz is its current president. Labor unions, even those representing public employees, are private actors, primarily funded by membership dues. In a case where every cause of action can only sound— Are you representing Ms. Cardona as well? No, Your Honor. I represent Ms. Mayer-Cruz and the union. Ms. Cardona is represented by Mr. Loop. So in this case, every cause of action can only sound against either a state actor or the recipient of federal or state education funds. UTLA is neither. Appellants' theory for bringing these claims against UTLA has never been quite clear. However, their reason for suing the UTLA defendants is apparent. This lawsuit is intended to punish the UTLA defendants' advocacy for a more rigorous ethnic studies curriculum. The district court recognized this and properly dismissed all claims against UTLA and Mayer-Cruz, in addition to all other defendants. Appellants attempt to circumvent this problem by alleging a conspiracy. There is no way to plausibly read the complaint and identify a conspiracy that survives Twombly or some other decisions by this court, including O'Hanley v. Weber. Despite multiple opportunities to amend and extensive meeting and conferring, appellants did not adequately plead that the UTLA defendants and LAUSD were engaged in a conspiracy. The conspiracy approach requires the plaintiff to show a meeting of the minds between the government and a private party with the intention to violate constitutional rights. The complaint does not show that. And plaintiff's request for additional discovery or attempts to amend will not make that showing either. The UTLA does not explain who at LAUSD shared UTLA's intentions or was aligned with their interests. In fact, it alleges that UTLA obscured its actions from LAUSD and violated state law, which would make the union's actions antithetical to any right or privilege created by the state, as this court has discussed in Wright v. SEIU and Laird v. UTLA. Finally, appellants' theory that UTLA can be brought in under conspiracy charges fails because they do not allege a constitutional violation. Can you address why shouldn't we give the plaintiffs an opportunity to amend their complaint? Because I know there have been many multiple versions of the complaint, but they are usually for technical basis, and the district court has had only one time it's actually addressed the substance of the complaint. So now that the district court and maybe this court identifies potential issues, shouldn't plaintiffs have an opportunity to amend to fix, if they can, any deficiencies? They should not, Your Honor, because this is not actually the first time that the district court's decision was not the first time the district court addressed the issues and problems embedded in this complaint. The case was dismissed once before, and that's at page 1211 of the record, and appellants were ordered to file a second amended complaint that explained each plaintiff's relationship to each defendant, and they did not do so. They did not allege sufficient facts, and they were aware of these problems from the beginning. But it didn't address standing issues or any of the merits issues that the district court ended up addressing. That is true. It did not address those at length. However, the parties had met and conferred on these issues repeatedly. Defendants' UTLA filed a – sent a letter very early on discussing these exact same issues, this exact same standing problem, and plaintiffs opted to disregard. They also failed to submit a complaint that alleged these claims against UTLA or really alleged any specific facts relating to individual appellees or appellants, teachers, students, anything. These allegations that bullying has taken place or that teachers have been penalized for issues relating to the curriculum have never been inserted into the complaint. And even if they were, the dismissal against UTLA would still be correct because they cannot be attributed to UTLA. UTLA does not control the disciplinary system at LAUSD. It does not have say over that. While UTLA involves a number of teachers who advocate for certain policies, that petitioning is not government action. It is action taken as private parties. Can you address – your friend on the other side mentioned something about there was a motion to stay discovery. Can you shed more light on that? Yes, there was a motion to stay discovery on the court's own authority as well as under the anti-SLAPP motion. The court did grant it under its own inherent authority to control discovery. And the motion primarily related to the court's authority to control discovery. The plaintiffs have requested additional discovery in order to support standing. But discovery under Twombly, they are not entitled to that if they cannot set forth a pleading that plausibly states a cause of action. Discovery is a privilege. It is something that you cannot open up the floodgates of discovery when there is no case and they haven't set forth a case. The constitutional violations that they claim to identify are weak. They are not founded in any sort of case law. And their attempt to hamstring this case to Assembly Bill 715 also fails because Assembly Bill 715 does not – it does not afford this court jurisdiction because it allows – well, it doesn't afford actually state court's jurisdiction either. It is in an administrative procedure for ensuring that schools properly discipline teachers or other administrators who might engage in discriminatory behavior. But doesn't it set forth what an interest is, a cognizable interest? I would say it does not, Your Honor. It sets forth that there may be – it sets forth that discriminatory behavior may harm students who are not in the classroom and who do not observe it. But it does not set forth any sort of harm or injury that can afford Article 3 standing. So what is its exact purpose then? Its exact purpose is to set forth an administrative process to ensure that discipline – that discriminatory behavior in schools taken either by teachers or other administrators is dealt with properly. It is not in itself a cause of action under either state or federal law. And its specific provision that the harm does not need to be personally suffered by an individual is in direct contrast to federal standing law and federal standing precedent. And from the initiation of this case, it's been clear that appellants do not have Article 3 standing. That's been the most significant problem, and it is something that I don't think can be – that cannot be surmounted by any sort of amendment. Well, I mean if their clients are being bullied, why wouldn't that be Article 3 standing? They do not allege that their clients have been bullied. Well, I mean they're – they say that they can allege that if they were given a chance to amend. Because Article 3 standing requires more than just an injury, Your Honor. It also requires that there is redressability as well as causation. Okay, but you would agree that being bullied is an injury. Yes, I would agree that being bullied is an injury, Your Honor, but I don't think it's an injury that could be traced back to any actions taken by UTLA or that a court could issue an order that would effectively end that bullying if they are only issuing that order against UTLA. That makes sense. I am close to the end of my time. However, I would like to add that this is the precise type of case that the California legislature anticipated when it adopted the anti-SLAPP statute. This is a case where defendants do not have any – or any reason to be in this litigation. They are solely being targeted for protective behavior, which is the advocacy for a certain curriculum. And they have been hailed into court and there have been attempts at extensive discovery into private documents solely in order to punish them for engaging in this advocacy. Can you address the argument that Burke v. Choi set new ground saying if we have to reinterpret a state law, then it doesn't apply in federal court? I do not believe that Burke v. Choi made that such a finding, Your Honor. They did decide that they would not rewrite the Delaware statute, but they did not say that choosing to apply only part of a law or choosing to apply the substantive parts of a law depending on how a statute is written is no longer permissible. I don't think they undermined Erie in that way. But we've – by – we don't apply certain parts of the anti-SLAPP statute like no amending complaint, no discovery. But we've essentially distorted the whole attorney fee provision because when you apply all of them in state court, the fee provision isn't that – you're not going to rack up that much legal fees because you don't have discovery. You have one shot with one complaint. Now that we're only applying just this fee provision, we've completely distorted it. I mean how could we have – right now we have the legal fees, something like $700,000. I don't figure what the figure is. I don't think anti-SLAPP fees are supposed to approach a million dollars. It's supposed to be something very quick, efficient, and sure, you get fees. But it seems something has gone wrong here if we're applying this kind of free-floating fee provision from the state law just in federal court here. I disagree, Your Honor. From Newsham, the court – this court has recognized that the fee provision is a powerful aspect of the anti-SLAPP statute. It is one of its major swords, I believe is the word used, and that the fee provision serves the substantive values of the statute because it makes it very difficult for plaintiffs to bring these types of cases in federal court or to bring these types of cases in any court where the purpose is harassment. So I think the fee provision still serves the overall purpose of the statute even as some of the other elements of the statute are no longer applied in federal court. I mean I think it was intended maybe as a slap on the wrist. Now it's a punch to the face now in terms of the impact. I mean it's kind of astonishing how large these fees can be in federal court, these anti-SLAPP motions. And the lack of interlocutory appeal too makes it – the harassment does work because you're dragged into this case for how many years? Three, four years, right? So it doesn't seem to serve any purpose at this point. I disagree, Your Honor. I think the threat of fees and the factor of fees is significant. I think it remains a significant – it continues to have a significant role in reducing the threat of these cases, particularly as certain plaintiffs have found the federal courts to be a very effective way to harass their political enemies or political – even political people who disagree with them politically. And I think that the fee provision helps prevent that and it helps serve that purpose. If the district court – since the district court concluded it lacked Article III jurisdiction, if that's correct, did it have jurisdiction even to award attorney fees under the anti-SLAPP law? I believe so, Your Honor. The anti-SLAPP law does not – the anti-SLAPP law does not limit itself to – or it mandates attorney fees when the plaintiffs show – or when the defendants demonstrate that the case is – serves the purpose of the anti-SLAPP law. It attacks speech and it also is not going to be a viable case. And one of the elements of – Those are all merits considerations, essentially. I mean, there's – I mean, when there's a dismissal for lack of jurisdiction, the court can't even consider the merits or lack thereof of claims. Isn't that correct? That is correct. But the anti-SLAPP statute does not necessarily really go – return to the merits of the case. It's whether it is a viable case, which does include standing. And a case in which the plaintiffs do not have standing to bring the claims or cannot bring these claims against specific defendants is still a case where the anti-SLAPP statute applies. We see the courts – the California courts doing that in cases like the – like Powell, like the Jarvis tax payers versus Powell. The California courts don't have an Article III jurisdiction requirement. This is true. Okay, great. Thank you.  Good morning, Your Honors. May it please the court. As Judge Bumate forcefully wrote in a recent opinion in Washington versus Trump, federal courts must not entangle themselves in contentious issues not properly before them. Doing so would risk turning the federal courts into a forum for any party to air generalized grievances. This lawsuit presents that very kind of generalized grievance. The plaintiffs complain about alleged curricular materials, but they don't allege that those materials are being taught in their classrooms, in their schools. They, therefore, have not pleaded the type of concrete and particularized injury that Article III standing requires. And that's reason enough for the district – for this court to affirm the district court's judgments. I do want to jump right to the amendment question. I have a little bit to add on that. The standard is abusive discretion. It's particularly differential where the plaintiffs have a repeated failure to cure deficiencies. And they have had a repeated failure in this case. First of all, there were three sets of motions to dismiss in this case. Fully briefed, that the plaintiffs had two opportunities to read through fully briefed motions to dismiss before they got to this current complaint. I would also direct the court, as Ms. Kyer did, to 7ER-1211. The district court actually did specifically address standing. The issue was that the complaint before this used pseudonyms. And the district court said, among other things, that the plaintiff's identities were, among other things, central to the issue of standing. They were given leave to amend and instructed to provide each plaintiff's relationships to the defendants, including but not limited to the status of the DOE plaintiff. That's whether it was a student, parent, or teacher, and the temporal scope of the plaintiff's involvement with defendants. So the court did very specifically pinpoint the issue of standing and said, please, in this next complaint, explain what your relationship is to these defendants. But that's not quite the same, you know, full-blown Article III ruling that the district court made later, right? I mean, that doesn't explain that there was no injury in fact. I mean, it's things of that nature. Well, I think it was clear that the district court was concerned with Article III standing generally. I mean, you had pseudonymous plaintiffs, so the question was, oh, how did these particular defendants harm you? Please clarify that. And that's exactly the problem we have in this case. We don't have any allegation that any of these defendants are teaching the curriculum to these particular plaintiffs or that they caused in the way that Article III requires any curricular materials to be taught to the plaintiffs. As I read to 1211, it doesn't say that they didn't allege an injury. I'm sorry. I didn't understand that, Your Honor. I'm sorry. When I'm reading page 1211, it doesn't say that they didn't allege an injury. So how are they on notice that they didn't allege an injury? The judge said standing. So he says that you need to explain how these – you need to explain what Article III requires. You need to explain why there's a – I mean I'm reading that into the word standing, why there's concrete and particularized injury, how there's causation, how there's redressability. It was because it was DOE plaintiffs, and the point there was I don't know who these people are. So I mean it doesn't seem to – I get your point mentioned, but it doesn't really directly address the issues that the court later identified. It was not a full-blown here's two pages of rulings on standing, and you can amend the complaint to answer each of these questions. But he pinpointed the issue of standing. Standing was obviously important. And like I said, there were fully briefed motions to dismiss that made most of these same arguments. Like none of our clients, dear plaintiffs, have caused you these injuries. Explain how they have. But usually we only deny a leave to amend if it would be futile. Here they're saying that they could allege some bullying has occurred by at least some members of their organization. So it doesn't seem futile anymore. Well, we still haven't heard any specific factual allegation of this person is a member of the organization and they've been bullied. But what we certainly haven't heard still, and I can't imagine a plausible allegation, is that the consortium defendants who are a nonprofit advocacy organization, by drafting a curriculum that maybe some teachers somewhere have adopted, have caused bullying of students who we don't even know if they attend schools in the same part of town, let alone in the same building or the same classroom. So that doesn't get them there. But you represent Ms. Cardona. Right. So if they were alleged that bullying occurred and it was traced back to teaching that she provided, I'm not saying they can't, but you would think that would meet the Article 3 standing. I think perhaps if they said Ms. Cardona is teaching one of our plaintiffs certain material in the classroom, which, by the way, there's no allegation in this complaint about what materials are actually being taught. I mean, it's a website that's publicly available to teachers. It's not directed to LAUSD teachers or anything like that. If they could say Ms. Cardona was teaching XYZ thing and there was a causal connection between that and bullying, that would get them closer to standing. But as far as I can tell, there's nothing close to that. Can you, you know, because the district court, after the standing analysis, actually went on to the merits, I do want to ask you a few questions about the merits. I mean, because I'm not sure if I agree with everything the district court said. I mean, do you agree that according to the complaint, it says for the plaintiffs, Zionism is an integral part of their faith. Do you agree that we have to accept that? I wouldn't dispute that. So if that's the case and we have to accept that, I mean, if there are there's curricular materials that's anti-Zionist, why wouldn't there be a potentially viable First Amendment free exercise claim? Because their children would be faced with anti-Zionist material, and that would potentially affect their ability to exercise their religion's beliefs. I mean, under Mahmoud v. Taylor, it seems right on point. I don't think this case is in the same universe as Mahmoud, Your Honor, for a variety of reasons. So Mahmoud, you had a policy that a school board adopted. Adopted and then implemented. Setting aside the standing issue, I understand that's the floating. But just in the merits, we assume the allegation is the complaint, and allegation complaint is they're teaching anti-Zionist material. So if you're a Jewish student who believes Zionism is an integral part of their faith, why doesn't that inhibit their free exercise of religion under Mahmoud v. Taylor? Well, because Mahmoud requires evidence or an allegation of some kind of penalty, coercion, or pressure. In Mahmoud, I mean, Mahmoud was a case about opt-outs, about whether the parents could opt their young K through 5, ages 5 through 11 students, out of instruction, out of being instructed on LGBTQ plus books. And they asked for a preliminary injunction allowing them to opt out of that instruction. And the court said, you can have that. And we're not going to go any further than that. At the end of the decision of Justice Alito's majority opinion, he in fact says, look, we're not trying to micromanage curriculum here. We're not trying to – we understand that that's an area where federal courts should be very careful about going. But you have to at least let these students opt out. The other thing, the other important feature of Mahmoud was that there was a penalty. There was guidance from the school board that teachers should reprimand or correct students. And again, these were K through 5 students, which the court emphasized. We're dealing with high schoolers in this case. But that teachers should reprimand or correct those students if they pushed back or challenged the premises of the books that they were being read. You don't have any allegation remotely approaching that kind of penalty, pressure, or coercion in this case. I do want to turn to the anti-SLAPP questions, unless the court has any other questions on standing or the merits. Burke does not say that you can't try to fit in a state statute with the federal rules. The problem in Burke was that the defendants were unable to fit it in. There was simply no way, because no matter how you tinkered with the procedures around the affidavit of merit requirement, you were still going to have a free-floating evidentiary requirement, which Rule 8 just doesn't require you to submit any evidence with the pleading. There was an unavoidable conflict, no way around it, which is not the same with California's anti-SLAPP statute. The Ninth Circuit has harmonized the substantive component of the anti-SLAPP statute with the federal rules of civil procedure. So Burke is consistent with the Ninth Circuit's precedence on anti-SLAPP. But even if you see some tension there or even if you think that it casts doubt, that's not enough. It has to be clearly irreconcilable, and Burke is not that. Can you address Judge Sung's question of the district court of jurisdiction to award fees if there's no Article 3 jurisdiction? Yeah. That issue was not briefed, and I know courts are obligated to look at their Article 3 standing even if it's not briefed, but we haven't had a chance to say anything about that. What I can say is that the district court's order was – the holding was not just based on standing alone. It was based on the merits, too. So the court was perfectly in a position, even if it didn't have standing, to award the fees anyway. I would say one last thing, which is I would ask, because that issue has never been briefed, for the court to – just on that particular issue, to find that there's – that all the other issues are in our favor, but to give at least a chance for briefing on that particular issue of whether the anti-SLAPP statute should be applied, notwithstanding the lack of jurisdiction, whether the fee shifting should happen, just on that sole question. Great. Thank you. Thank you, Your Honors. Good morning, Your Honors. May it please the court, Michelle Goldsmith on behalf of the nominal defendant, the Los Angeles Unified School District. Anti-Semitism is abhorrent in any form, and judicial intervention is essential when necessary. But here, this court does not need to change the district court's decision, because that is not this case. There is no standing, the issue is not ripe, the district is immune, and appellants have not stated a claim. For the first time, we hear that the case can be amended. That amendment would be the sixth opportunity to plead, even though it's only at the second amended complaint. Bullying is abhorrent, but that is not this case. This is not a case about unidentified Jewish students being bullied. The Los Angeles Unified School District has a lot of policies, practices, and procedures in place, including the UPC, which is our uniform complaint procedure that anyone can bring a claim that we are not following practices, policies, and they are investigated, they're looked into. This case specifically is about the, if the district has adopted anti-Semitic curriculum. And it is that lack that this case should not be amended, because it is not alleged and it can't be alleged that the district is not following the law or our ethnic studies guidelines. Counsel, does the district need to adopt, if they allow teachers on their own to teach anti-Semitic curriculum, wouldn't the school district be responsible just as much? But that's not this case, that would be a complaint. Well, I mean, it is the case that they are alleging that teachers, at least two teachers have taught this curriculum that is alleged to be anti-Semitic, right? Right. Well, why wouldn't the school district be responsible for that? Well, we would, but in a different forum, not this case and not bought by a decision by the Ninth Circuit. The Los Angeles Unified School District has disciplinary guidelines in place where allegations are made against teachers. And we are before the Office of Administrative Hearings, which is a separate independent body where people can bring complaints. Is there any allegation that any complaint was made to the district about anything that the defendant teachers were teaching? I know it's outside of the record, but to answer your question, no. But, I mean, it's not an exhaustion requirement. I'm sure LAUSD has some administrative process, but you don't have to go through that process. No, certainly. I'm just saying that the allegations of this complaint have to do with the school district, prospectively, might injure some students in the future if this curriculum may be adopted. But the complaint alleges that it is being taught now, and if you're taking facts in favor of the non-moving party, I mean there is something to it. Assuming that the toolkit is reflective of what it's allegedly being taught. We have all this anti-Zionist rhetoric about finance by Zionists using, quote, any means necessary. And these are classic anti-Semitic tropes, elders of Zion type rhetoric. So if that's true and we have to accept that's true, I mean that's setting aside the standing issue, thinking connected. It seems like a viable claim. Your Honor, thank you. And I agree. Those types of anti-Semitic rhetoric are tropes and abhorrent. But we have to look at the standing allegations. We cannot set those aside. And the plaintiffs have had five opportunities to allege specific facts as to how a district court can rule against the defendants and the nominal defendants of the district. Now that the complaint's been filed and you're aware of these allegations, has the school district investigated whether or not these teachers are teaching this curriculum? I know that's outside of the record, Your Honor. But certainly the district is aware of these allegations. I'm personally in contact with the district. I have confirmed that the ethnic studies, these guidelines have not been adopted. And that there are mechanisms in place to deal with these types of concerns that are brought to the district's attention. We take these allegations of anti-Semitism very seriously. We take allegations of bullying very seriously. But there is no evidence, and it would be futile, to amend a complaint to allege general allegations of bullying. Why is that? Because what I've heard, Your Honors asked plaintiffs' counsel to represent, if they could make an amendment, what that amendment would be. Plaintiffs' counsel gave you a general statement of bullying, but did not make any factual representation to this court to dispel the futile of a amendment. I would expect that if they would convince this court to remand to allow a third amended complaint, which would be the sixth pleading, that they would tell you exactly how they could amend that complaint. And an allegation generally of bullying does not satisfy that requirement. As Your Honors mentioned, we have 38,000 teachers. We have hundreds, thousands of different types of curriculum that's being taught. As I understood, the allegation is that bullying against Jewish students has increased. And then if they could draw that traceable to this use of curriculum, why is that not an Article III injury? Because they say they may, but not that they could. So we just have to see what they have to say, though. Why would we stop them from? Bullying is an unfortunate circumstance of our current societal makeup. No one says that bullying in any context, based on any protected status, would be something that we wouldn't want to fight and dispel. But you have to go back to what can the plaintiff tell you now that would make an amendment not futile? Because there needs to be something specific that connects a curriculum that has not been implemented, right? The district has represented in all of our motions and pleadings that this curriculum has not been adopted because it has gone through our rigorous committees and evaluations and has not been adopted because of its potential effects that would be anti-Semitic in nature. If I understand your argument correctly, Counsel, you're saying there's a lot of specificity that would be required to draw the causal link between the alleged conduct and the alleged bullying. Yes, Judge Song. And you're saying the proffer doesn't even come close to providing that specificity. But I guess unless we were to say, you know, show us an amended complaint right now, I mean, if they are generally representing they could meet that standard, is there a reason why under our liberal standard for allowing amendments we wouldn't at least let them try? I think this is where we have to go back to the district court and their analysis because that argument was made at the district court level. And the district court specifically found when that argument was made, and this is at the record, Volume 1, AA 49. They quoted from the curriculum, described an alleged injury, and pled or at least argued that they would plead further the discriminatory teaching material. But when they claimed that they could amend, the court specifically found that the allegations would add nothing to the complaint because they looked at the issue of standing and that there was nothing that they even represented in the request to amend that would have granted standing. And this could continue indefinitely because cases come up all the time when facts are not pled, they're dismissed, and some other harm happens like in the future. I would advise or recommend to this court to maintain the dismissal, but it would be not without prejudice, but if a harm happens in the future, that's an actual harm that they then can plead these allegations against the district or the other defendants, then they would have the opportunity to do so. But where we are now, an amendment would be futile. Can you address sovereign immunity? I know I've already gone over my time. That's okay. I assume that Judge Lee will allow you to answer my question. All right. Thank you. I appreciate that, Judge Sun. The 11th Amendment has always provided immunity to arms of the state. School districts have traditionally been held subject to the 11th Amendment immunity. I know that plaintiff's counsel, I'm sorry, appellant's counsel, has cited now the United States Supreme Court of Gillette from 2026 saying your honor should look to that to say that a public school district should no longer be immune. But that case is very factually distinguishable because in that case, it was a New Jersey Transport Transit Corporation. It was a corporation that was acting not as the arm of the state because it was structured as a legally separate entity. It possessed corporate powers, and the state was not liable for its debts and liabilities. Which is very different from the Los Angeles Unified School District and every school district within the state of California. There is nothing in either the Mitchell decision or the Cohen decision. Can I ask how that works on the financial front? My understanding is the school district is responsible for its liabilities, but I guess there's a state formula that requires a minimum amount of money for each district so that the state would backfill if you miss, if you're lopsided. Is that how it would work? Essentially. And so the state, you know, everybody watches the news. And I know this is outside the record, but the state is eventually and would be responsible for the Los Angeles Unified School District and the school districts within it. And we're self-insured. Yeah, but not because the state is liable for the district. It's just that it's liable for a flat amount of funding, right? Yes, we are state and federally funded. And the financial piece of it, I know, was discussed in both Cohen and Mitchell. And the emphasis, you know, seemed to shift. But there has been no case and appellant can't cite to any case that is abrogated the 11th Amendment immunity. And it is necessary for the Los Angeles Unified School District to be immune under the 11th Amendment. And the immunity that it's afforded is important. Did I answer your question, Judge Sun? I think so. I mean, it seems that the court in Gillette was saying that the separate legal entity factor is the most important factor. We are definitely not a corporation. Okay. I mean, you have your own board. It's elected. It seems to be a separate entity that can be sued in its own name. That is all true. But the Los Angeles Unified School District, like all school districts within the state of California, report to the State Board of Education. And we take direction from the state legislature. We are required by state mandates to adopt curriculum. LAUSD is not an independent corporation. You're saying the state is effectively managing the district? We are bound by, I wouldn't say managed, but it's the Los Angeles Unified School District and the districts within the state have very strict guidelines that are implemented, that are directed by the state and implemented at the local level. Isn't everyone subject to state law? That's a very broad question. That's why I don't know how meaningful that is. You're just saying that if the state passes a law, we have to follow the law. Well, when we look at the 11th Amendment, we're looking at both federal, you know, what applies to under federal law and what applies under state law. So yes, as to answer Judge Sung's question, the Los Angeles Unified School District can be sued, right, and tort for negligence. And someone trips and falls on our campus. We are bound by our obligations under, you know, different California statutes. So we do have to follow state law like any entity, but it's not just a corporation. Right. Every individual has to. Right. And so we're trying to figure out what is the difference here. What can you point to? For example, California laws can say all corporations must do X, can't do Y. Right. They think the same thing. They could say all school jurisdictions must do A, B and C and can't do all these other things under state law. What separates, in your view, makes the district different from a corporation? That we were an act as an arm of the state. Right. Other than just saying that. I mean, you have to point me to something. What is it in the state law or in the structure or in the ability of the state to control what that is different from the state's general regulatory ability? So the California Education Code provides very specific codes that govern the Los Angeles Unified School District and all of its school districts in very specific areas. Teachers, curriculum, finances, education. Is there a specific statute for a particular area, Your Honor, that you want me to focus on? I guess I'm just wondering. I mean, it sounds to me like you're saying the degree of control or oversight exercised by the state is greater than it is for non-arms of the state. Yes. Okay. Okay. I think I've used my time and more than that. So do you have any other questions, Your Honor? Great. Thank you. All right. Thank you so much. I'd like just to pick up where counsel left off on the issue of control. If you look at Gillette, the Gillette case from the Supreme Court at page 869, the court said that control is not especially probative because ultimate control of every state-created entity resides with the state, even those that are not arms of the state. Cities, counties, school boards, and state-created banks have all been recognized as legally separate entities from the states. And before that, the court at 868 noted that the key factor for the arm of the state is whether it's a legally separate entity that can sue and be sued, hold property, make contracts, and incur debts. LAOSD can do all of those things under state law. At a minimum, we should get the right to, in our leave to amend, to be able to argue that they are no longer an arm of the state. I'd also like to address the point that counsel was making about the complaint process in LAOSD. As we pointed out in our opening brief on the merits 64 to 65, one of the many ways we could amend our complaint is to make an allegation that there was a particular teacher who spent over a year trying to bring a complaint of anti-Semitism through LAOSD's formal processes and was not – and was sort of pushed aside, and the process did not work and did not result in any changes. Moving briefly to the anti-SLAPP question, I think this is a – what this court has done to the anti-SLAPP statute has turned it into a free-floating attorney fee provision because every other significant – or as I think Judge Bress said in his concurring opinion, of the four pillars of the anti-SLAPP statute, three have been taken away, as we pointed out in our briefing. Other parts that might not be of the four pillars but other parts of the statute have been taken away, and there's no provision in the law after Burke v. Choi to allow – to cherry-pick a fee provision from a state procedural statute and then apply it to essentially the grant of a Rule 12b motion. That is just not how the process works. The federal rule answers the question. In terms of the leave to amend, the example that was discussed of the prior amendment on the DOE, that was a very different situation. The original complaint had my clients as DOEs, I think for very sound reasons because they didn't want to be exposed to more hate and bullying for their children. The district court disagreed and said, no, you have to put your names on the complaint. That was a difficult decision for them to do. They did it. But there was nothing in that – in the motion denying the ability to proceed as a DOE that led to any of the significant discussions of Article III standing that came out in the 60-some-odd page ruling that is on appeal here. And we should have an opportunity to at least have one point to both address the district court and, of course, this panel's indication of what needs to be fixed. And I'll conclude by just noting that I think part of the issue in the district court is I think the district court has a different understanding of anti-Semitism than the plaintiffs. The district court repeatedly said that this case is nothing more than just a disagreement about how to teach about Israel and Palestine. That is not what this case is about. This case is about virulent anti-Semitism that is being taught in many classrooms and that is being spread to other classrooms that is creating a hostile environment for Jewish teachers and Jewish students in LAUSD. And I would appreciate the opportunity to have this case proceed, but, of course, without the anti-SLAPP aspect to it. Unless you have any questions, I'm happy to submit. Great. Thank you, everyone, for the helpful advocacy. The case is submitted.
judges: LEE, BUMATAY, SUNG